# EXHIBIT A

## **DECLARATION OF MARK SPECTOR**

STATE OF ARIZONA    )
                    ) ss.
County of Maricopa  )

In accordance with the terms of 28 USC 1746, I, Mark Spector, declare under penalty of perjury that the following is true and correct:

### I. INTRODUCTION

I have been asked by attorney Mick Levin to serve as an expert witness regarding the standard of care for an insurance agent in Arizona in the matter of *Fink v. Brown & Brown Program Insurance Services, Inc.*, in the United States District Court for the District of Arizona, civil action number: 17-03869-PHC-DLR.

As I understand it, there are two primary elements I have been asked to address: whether Charles Fritsinger fell below the standard of care to Edward Fink, M.D. and whether Brown & Brown Program Insurance Services, Inc. ("Brown & Brown) fell below the standard of care to Charles Fritsinger.

In my roll as an expert, I may make assumptions based on disputed issues of fact. When doing so, I will attempt to state as much. Some of my opinions rely upon a jury determining a disputed issue of fact in a particular manner. My opinions may differ if a disputed issue of fact is decided differently by the jury.

By way of background, I was an independent insurance agent for approximately 40 years. I have provided my expertise to customers in the areas of property and casualty insurance as well as professional liability coverage. A copy of my current curriculum vitae is attached as Exhibit A. I have not published any articles or publications. My fee schedule for this case is as follows (a different fee schedule has been used in other cases):

$250.00 per hour for deposition (subject to a 2-hour minimum)
$250.00 per hour for research, report preparation, telephone calls, or meetings
$100.00 travel to location in Maricopa County, Arizona

In the last four (4) years, I have testified in the following matters:

*Yi-Moore v. AIMPRO*, Maricopa County Superior Court, CV2016-001933, April 24, 2018

### II. MATERIALS REVIEWED

The following is a list of materials reviewed which were provided to me by attorney Mick Levin (depositions include exhibits):

1. Safeco Insurance Homeowners quote prepared on 3/1/2012

2. Safeco Homeowners Insurance application signed 3/5/2012

3. Safeco Insurance Homeowners policy information regarding policy number OY6968993, prepared on 3/1/2012 and covering 3/5/2012 to 3/5/2013

4. Safeco Insurance umbrella policy documents, policy number UY6969041, covering 3/5/2012 to 3/5/2013

5. Safeco Insurance umbrella policy and declarations page, policy number UY6969041, covering 3/5/2013 to 3/5/2014

6. Safeco Insurance declarations page and binder for auto policy number Y7736505, prepared on 3/1/2012 and covering 3/5/2012 to 3/5/2013

7. Safeco Insurance auto insurance declarations page and policy for auto policy number Y7736505, covering 3/5/2012 to 3/5/2013

8. Safeco Insurance letter of January 27, 2015, regarding change to umbrella policy

9. Insurance paperwork with Edward Fink's handwritten notes

10. State Farm certificate of liability insurance, dated 2/11/2015

11. Letter from Jon D. Laskin, State Farm agent, dated 2/11/2015

12. Auto insurance documents regarding Christopher A. Cantreel, including USAA declarations page, Affidavit of No Additional Insurance, settlement check, and release of all claims against Mr. Cantreel

13. Arizona Crash Report number 2013-1485970.

14. Deposition of Edward Fink dated 04/29/2016

15. Deposition of James La Verdi dated 08/08/2016

16. Deposition of Charles Fritsinger dated 08/08/2016

17. Deposition of Charles Fritsinger taken September 5, 2017

18. September 7, 2017, Agreement and Covenant Not to Execute

19. Deposition of Edward Fink dated 07/24/2018

20. Deposition of Joni Fairbrother dated 07/10/2018

21. Deposition of Charles Fritsinger dated 07/31/2018

22. Declaration of Mark Spector dated 02/02/2016

## III. FACTS

A summary of the facts relevant to my review follow. Some of the facts may be disputed. Where there is a factual dispute, it is incumbent upon the trier of fact to determine the dispute.

Summary of Deposition of Edward Fink taken on April 29, 2016:

Edward Fink, M.D. is an orthopedic surgeon. He previously worked in Washington, D.C. and Virginia. He moved to Arizona and was employed by Banner Pediatric Specialists.

After moving to Arizona, Dr. Fink sought auto, home, and umbrella insurance. He performed an internet search and located James LaVerdi, an insurance agent. Dr. Fink understood that Mr. LaVerdi worked for Charles Fritsinger, another insurance agent.

Dr. Fink did not have any specialized education or training in insurance products. He was generally aware that underinsured motorist coverage provided coverage to him if an "at fault" driver caused him an injury and did not have enough insurance to compensate Dr. Fink. Dr. Fink had an umbrella policy for approximately 10 years before moving to Arizona.

Dr. Fink and Mr. LaVerdi discussed Dr. Fink's insurance needs. Some of the discussion addressed proper coverage for someone of Dr. Fink's age, his category of life, and his goals in purchasing insurance.

Based at least in part upon Mr. LaVerdi's counsel and guidance, Dr. Fink purchased a policy of automobile insurance for liability, uninsured, and underinsured coverage in the amount of $500,000.00. Dr. Fink also purchased an umbrella policy. The umbrella policy extended Dr. Fink's coverage to $2,000,000.00. Dr. Fink was unaware that the umbrella policy had an exclusion for underinsured motorist coverage. Mr.

LaVerdi never indicated that there was an exclusion for underinsured motorist coverage in the umbrella policy. Dr. Fink indicated that if Mr. LaVerdi had indicated there was such an exclusion, he would have sought the coverage elsewhere.

Dr. Fink never spoke with Mr. Fritsinger.

A letter was sent to Dr. Fink offering him underinsured motorist coverage in the amount of $1,000,000.00 after the inception of the policy. It is Exhibit 8 to the deposition. The letter indicates it came from Charles Fritsinger and that this was "new" coverage. Dr. Fink stated he did not recall receiving the letter.

Dr. Fink was involved in an accident in October of 2013. After the accident, Dr. Fink was no longer able to perform surgery. Dr. Fink was terminated from Banner after the accident. Dr. Fink believes that at least one reason why he lost his job at Banner was because of his inability to perform surgery. Dr. Fink received $50,000.00 from the "at fault" driver. Dr. Fink received $500,000.00 from his underinsured motorist coverage.

Summary of the deposition of Charles Frtisinger taken on August 8, 2016:

Mr. Fritsinger was in the business of selling insurance for between 10 and 20 years. Prior to that, he worked for the Maricopa County Sheriff's Department as a deputy in the organized crime division. Mr. Fritsinger started off as a captive agent for Farmers. He did not recall any other employment as an insurance agent before or after Farmers other than when he started his own independent insurance agency which he had for at least 5 years.

Mr. Fritsinger's independent insurance agency sold insurance policies for, perhaps among others, Safeco, Metropolitan (also known as MetLife), Infinity, Progressive, Hartford, American Modern, and Transwestern General. Mr. Fritsinger could not recall if any of the insurance companies he sold insurance for had umbrella policies and, if they did, whether they had underinsured motorist coverage available in the umbrella policies.

Mr. Fritsinger testified that Mr. LaVerdi worked with him as an independent contractor. Mr. LaVerdi generated his own clientele. Mr. Fritsinger could not recall how he came to meet Mr. LaVerdi nor what qualifications Mr. LaVerdi had other than he was licensed to sell insurance. Mr. Fritsinger testified that Mr. LaVerdi was able to sell insurance policies through Mr. Fritsinger's agency, although, Mr. Fritsinger would be listed as the insurance agent.

Mr. Fritsinger did not supervise Mr. LaVerdi in any way. The only instruction that Mr. Fritsinger provided to Mr. laVerdi was to make sure that the money for the sale of policies was given to Mr. Fritsinger and to make sure that Mr. LaVerdi did what was necessary in case of an insurance company audit. Mr. Fritsinger did not discuss what was or was not covered in insurance policies with Mr. LaVerdi nor did he discuss with Mr.

LaVerdi the coverages that were available. Mr. Fritsinger did not know what Mr. LaVerdi knew about the insurance products he was selling.

Mr. Fritsinger explained several steps he performed when contacted by a potential new customer: 1) he would find out the potential new customer's current insurance coverage; 2) determine the adequacy of the potential new customer's current coverage; 3) make recommendations for additional coverages – if appropriate; and 4) explain why he was recommending additional coverages. Mr. Fritsinger testified that part of the conversation with a potential new customer included telling them what the policy covers and what the policy did not. Mr. Fritsinger testified that it is the standard of care for an insurance agent to speak with potential new customers who purchase an umbrella policy about what the umbrella policy covers and what it does not.

Mr. Fritsinger's own experience with umbrella policies was scant. He indicated that he only infrequently sold umbrella policies and was unaware of whether umbrella policies would provide underinsured motorist coverage. Mr. Fritsinger testified that he had never sold underinsured motorist coverage in an umbrella policy. Mr. Fritsinger testified that Mr. LaVerdi had never written an umbrella policy while he worked with Mr. Fritsinger, except for to Dr. Fink.

Mr. Fritsinger never spoke with Dr. Fink.

Mr. Fritsinger testified that Exhibit 8 to Dr. Fink's deposition has the Fritsinger Insurance Agency's address in the upper, right-hand corner and is addressed to Dr. Fink. Mr. Fritsinger testified that he should have a copy of Exhibit 8 in his file for Dr. Fink, however, he does not have a file for Dr. Fink in his office and never received a copy of Exhibit 8.

Summary of the deposition of James LaVerdi taken on August 8, 2016:

James LaVerdi did not receive a high school diploma, but instead, received his GED in 1976. He was in the Navy for two years and was a machinist mate. The majority of his career, from the mid-to-late 1970s until 2008, was spent as a heavy machine operator or truck driver. In 2008, Mr. LaVerdi decided to make a "big time" career change. He became a licensed insurance agent.

Initially, Mr. LaVerdi sold health and life insurance. After meeting Mr. Fritsinger through an employment advertisement, he decided to obtain a property and casualty insurance license. He studied for the test using an internet-based study program.

Mr. LaVerdi's first job selling property and casualty insurance was as an independent contractor or employee of Mr. Fritsinger's insurance agency. He started in approximately November of 2009. Mr. LaVerdi received no training from Mr. Fritsinger

and Mr. Fritsinger did not supervise Mr. LaVerdi. Mr. Fritsinger only looked over the files to make sure they were done properly.

Mr. LaVerdi learned about the insurance products he sold to customers from studying on the internet. The only instruction Mr. LaVerdi received from Mr. Fritsinger was an example of how to quote a policy and codes that would allow Mr. LaVerdi to access insurer's price-quoting software. Mr. Fritsinger did not give any instruction to Mr. LaVerdi on how to advise clients or on what products to recommend.

Mr. LaVerdi testified that he learned about underinsured motorist coverage from internet articles and magazines as well as phone calls to insurance companies. He learned about umbrella policies from Mr. Fritsinger telling him that he could sell them and that the insurance policy quote system for Progressive and Safeco would queue him to inquire about an umbrella policy if he sold a high-limit insurance policy.

Mr. LaVerdi understood that an umbrella policy would cover a person for liability above the amount of their underlying policy. Mr. LaVerdi did not know that underinsured motorist coverage was available in an umbrella policy.

Mr. LaVerdi testified that Dr. Fink's umbrella policy was the only one he had ever sold and that he could only recall three inquiries about umbrella policies, including Dr. Fink. Both of the other inquiries were after he sold the umbrella policy to Dr. Fink.

Mr. LaVerdi testified that Dr. Fink suggested getting an umbrella policy. Mr. LaVerdi testified that he would not have told Dr. Fink the umbrella would cover him in case of a catastrophe.

Mr. LaVerdi testified that Dr. Fink had an extensive file. Mr. LaVerdi requested the file from Sea Mountain Insurance, the insurance agency that purchased Mr. Fritsinger's insurance agency. He was informed by Sea Mountain Insurance that there was no file for Dr. Fink and that Mr. Fritsinger had asked for it as well. Mr. LaVerdi did not have a copy of Exhibit 8 in his own file for Dr. Fink. Mr. LaVerdi also testified that his notes of conversations with Dr. Fink are also in the missing file.

Mr. LaVerdi testified that he would not have informed Dr. Fink one way or the other on whether underinsured motorist coverage was available in an umbrella policy. He also testified that he only checked with Safeco and no other insurers.

Summary of relevant insurance documents for Edward Fink:

Dr. Fink received policy quotes for home, auto, and umbrella policies. The policies reflect a high-end insurance consumer with $500,000.00 single limit coverage for automobiles ($100,000.00 for property damage). Low deductibles are also noted. Umbrella coverage of $2,000,000.00 was provided. The declarations page for the umbrella policy is silent in regard to underinsured motorist coverage. The umbrella

policy has an exclusion for uninsured and underinsured coverage unless an additional endorsement is purchased. Policy periods appear to begin in March of 2012 and were renewed in March of 2013.

Several pages of a policy quote contain hand-written notes. One page indicates "umbrella – catastrophe", "$2 million $205", and "1 million $120". The agent listed on one page is "JAMES LAVERDI". A hand-written note indicates "agent name change" – the word "change" denoted by a triangle. Some hand-written notes appear to indicate Dr. Fink requested additional or more coverage than was printed on the quote and summarize "credit[s]" for things such as fire extinguisher, deadbolt, and smoke alarms.

$1,000,000.00 underinsured motorist coverage was added on January 27, 2015 for an additional yearly premium in the amount of $49.55.

Summary of the deposition of Charles Fritsinger taken on September 5, 2017:

Charles Fritsinger was deposed a second time in late 2017. He supplemented his work history indicating that he was a direct writer of insurance for Century Insurance, Allstate Insurance, and Mutual of Omaha. He testified that he did not have errors and omissions insurance for himself when he was a direct writer of insurance for these companies, believing that the insurer provided such coverage for him.

Charles Fritsinger testified that he has only sold property and casualty policies. He testified that he has never sold a professional liability policy. He indicated that he has never taken any classes, received any instruction, or done any independent research on errors and omissions or professional liability policies.

Mr. Fritsinger supplemented his prior testimony indicating that he had his own independent insurance agency for 15 or 20 years. He purchased errors and omissions liability insurance for his agency. Mr. Fritsinger testified that insurers would not let Mr. Fritsinger sell insurance policies to consumers without proof of errors and omissions insurance.

Mr. Fritsinger's first insurance policy was through Westport Insurance. That insurance policy terminated, and he purchased new insurance through Brown & Brown Insurance Agency. Mr. Fritsinger indicated that no one explained to him that the new policy would not cover prior acts that occurred before the inception of the new policy or "retroactive coverage" to him. Mr. Fritsinger testified that no one from Brown & Brown explained a "claims made" policy to him either.

Mr. Fritsinger testified that he sold his insurance agency on October 16, 2014 and cancelled his insurance coverage through Brown & Brown. Mr. Fritsinger testified that no one talked to him about "tail coverage" or offered to sell him tail coverage.

Mr. Fritsinger testified that if he was offered "retroactive coverage" or "prior acts coverage" he would have purchased it. Mr. Fritsinger testified that if he had been offered "tail coverage" or an "extended reporting period" at a reasonable price, he would have purchased it.

Mr. Fritsinger testified that after he received the lawsuit from Dr. Fink, he reported it to the carrier. He was denied coverage because he did not have "retroactive coverage" or "tail coverage."

Mr. Fritsinger reported that he paid counsel to defend him out of his own funds; he had a trial date in a couple of months; and that he was afraid if he went forward to trial he would be financially ruined.

Summary of the deposition of Joni Fairbrother taken on July 10, 2018:

Joni Fairbrother works for an organization that, among other things, provides insurance to insurance agents. The organization, Independent Insurance Agents & Brokers of Arizona, is known as "the Big I". The Big I provided errors & omissions insurance to Mr. Fritsinger's insurance agency prior to Brown & Brown.

Ms. Fairbrother did not appear to have much in the way of first-hand, personal experience with Mr. Fritsinger. She indicated that she teaches loss control seminars; that such seminars may discuss claims-made policies; and that Mr. Fritsinger attended such a seminar in 2007 or 2008. Ms. Fairbrother testified that Mr. Fritsinger would sometimes not see his emails, so they would sometimes fax and email him to ensure receipt.

Documents from the Big I indicated that Mr. Fritsinger was contacted in December of 2011 about his errors and omissions insurance expiration. At that time, Mr. Fritsinger is reported to have said he wanted to self-insure and an employee of the Big I indicated that if he did, he would lose his prior acts coverage. On that same day, Mr. Fritsinger appears to have requested a larger deductible, but it was not approved. The Big I informed Mr. Fritsinger with the non-approval that if he did not renew his policy, he would lose prior acts coverage. Mr. Fritsinger appears to have renewed his insurance rather than self-insured. Mr. Fritsinger renewed his insurance again in 2012. The declarations page from the renewal indicates that the insurance is a "claims-made" policy. There is no explanation of the difference between a "claims-made" and an "occurrence-based" policy.

The Big I, according to company documents, emailed, but did not appear to fax or send via regular mail, a letter to Mr. Fritsinger describing "tail coverage" when Mr. Fritsinger failed to renew in December of 2012.

Summary of the deposition of Edward Fink taken on July 24, 2018:

Dr. Fink was deposed again on July 24, 2018. Many of the same subjects were covered as in his previous deposition. Many subjects that were not related to insurance matters were also covered, for example, his employment history and unrelated claims.

Dr. Fink testified that the factual basis for his claim against Mr. LaVerdi was that he did not advise, recommend, or procure underinsured motorist coverage in Dr. Fink's umbrella policy. Dr. Fink testified that the factual basis for his claim against Mr. Fritsinger is that Mr. LaVerdi worked for Mr. Fritsinger.

Dr. Fink testified that he did not know one way or another whether he received Exhibit 8 – previously described in his first deposition. He testified that he was always under the impression that he had underinsured motorist coverage in his umbrella policy. Exhibit 8 indicated that underinsured motorist benefits "provides you with additional ability to pay for significant medical bills and replace lost wages while you're unable to work."

Dr. Fink testified that he did not believe that Safeco ever provided him with a copy of the umbrella policy. He indicated that he received the declaration page and that was in his records, but that the policy was not in Dr. Fink's records.

Summary of the deposition of Charles Fritsinger taken on July 31, 2018:

Mr. Fritsinger was deposed a third time on July 31, 2018. He only recalled one of the prior two depositions. In fact, it appeared Mr. Fritsinger had a difficult time with recollection of prior events. Mr. Fritsinger also appeared not to understand some questions that were being asked of him during his third deposition.

Mr. Fritsinger indicated he did not take any courses for selling insurance but did recall having taken a loss control seminar. He did not recall if errors and omissions claims was covered at the seminar. Mr. Fritsinger repeated his work history and indicated he had errors and omissions insurance through his employers until he was self-employed. Mr. Fritsinger again testified that he sold property and casualty insurance. Mr. Fritsinger testified he probably sold property and casualty insurance for about 30 years.

Mr. Fritsinger testified that he never read entire policies, even the ones he sold. He indicated that insurance policies are very boring and full of legal jargon. He testified that he tried the best he could to understand what he read and asked questions of underwriters and claims adjusters when needed.

Mr. Fristinger recalled having settled the case Dr. Fink brought against him. Mr. Fristinger testified that he was prepared to file for bankruptcy if he could not settle the case against him.

Mr. Fritsinger described his errors and omissions policy through Brown & Brown as being "the dumbest policy I ever seen", a "piece of garbage", "the worst policy ever

designed by any mankind in my opinion", and that he "had no idea what tail coverage or any of that crap was."

Mr. Fritsinger testified that the only written communications he recalled receiving from Brown & Brown were those produced at his second deposition held on September 5, 2017. Mr. Fritsinger testified that he did communicate with CITA Insurance Services but did not know it was another name for Brown & Brown.

Mr. Fritsinger testified that his Westport policy indicated that the "retroactive date" indicated he had "full prior acts" coverage. When questioned further, however, Mr. Fritsinger had no idea what that meant. According to Exhibit 46 of his deposition, Mr. Fritsinger obtained a quote for full prior acts coverage from CITA. The quote stated it was valid for thirty (30) calendar days from the date of the email conveying the quote or December 6, 2012 or until the date of the expiring policy or December 12, 2012. The total premium for the quote was in the amount of $1,250.00. According to Exhibit 47, Mr. Fritsinger provided additional information to CITA. According to Exhibit 48, Mr. Fritsinger provided CITA with a check in the amount of $1,250.00 on December 27, 2012. According to Exhibit 49, on December 27, 2012, CITA provided Mr. Fritsinger a new quote that was similar in all respects to the prior quote except that it omitted prior acts. Exhibit 46 did not indicate that prior acts would be omitted if the quote was not accepted by December 12, 2012. No other documents appear to provide Mr. Fritsinger the opportunity to obtain prior acts coverage after December 12, 2012.

Mr. Fritsinger did not appear to understand claims-made policies. It appeared that he believed his errors and omissions policy was an occurrence-based policy rather than a claims-made policy. Initially, when read the portion of the policy describing that it was a claims-made policy, Mr. Fritsinger thought the policy terms operated more like an occurrence-based policy. When portions of the claims-made policy were discussed or explained to him, Mr. Fritsinger appeared to understand the provisions. However, Mr. Fritsinger indicated that, at the time he purchased his error and omissions policy, he did not know how a claims-made policy worked.

Mr. Fritsinger testified that when he sold his insurance agency and retired, he contacted CITA or Brown & Brown to notify them of the retirement and request a refund. He received an email indicating he would have to provide a written request to cancel his insurance as well as additional information about "tail coverage." Mr. Fritsinger provided a written notice of cancellation to Brown & Brown indicating that he had sold his insurance agency.

When asked during his deposition, Mr. Fritsinger did not appear to understand "tail coverage" or the need for it. Again, it appeared that Mr. Fritsinger believed his errors & omissions policy was similar to an occurrence-based policy rather than a claims-made policy. Again, when "tail coverage" was explained to him, Mr. Fritsinger seemed to

understand what it covered. Mr. Fritsinger testified that no one from Brown & Brown explained "tail coverage" to him.

Mr. Fritsinger testified that he would have paid for "tail coverage" had he understood the coverage. He testified that he would not have paid for "prior acts" coverage. This is contrary to his prior deposition in 2017.

## IV.   A BRIEF EXPLANATION OF INSURANCE POLICIES

Most consumers are familiar with an "occurrence-based" insurance policy. An occurrence-based policy provides coverage for a covered loss as defined by the policy if the covered loss occurs during the policy's effective period. For example, an auto insurance policy may cover for theft from January 1, 2012 until December 31, 2012. If the vehicle was stolen during the policy period, the loss would be covered by that policy – regardless of the date the claim was made for the loss.

"Claims-made" policies are very unique and distinctly different from "occurrence-based" policies. For the most part, "claims-made" policies are only sold to professionals, such as doctors, lawyers, and insurance agents. "Claims-made" policies only cover a loss if the loss occurs and the claim is made during the policy period. If the loss occurs prior to the inception of the policy or the claim is made after the expiration of the policy, there would be no coverage. Using the above example, if the vehicle was stolen on December 31, 2011 or was reported stolen on January 1, 2013 (even if it was stolen the night of December 31, 2012), there would be no coverage for the loss.

"Retroactive coverage" or "prior acts coverage" may be a part of a "claims-made" policy. This type of coverage is usually provided if the insured has successive coverage over multiple policy periods. Prior acts coverage will cover losses originating during a prior policy period but reported during a new policy period. Using the same example as above, if the vehicle was stolen on December 31, 2011 and reported on January 1, 2012, then the claim would only be covered if there was prior acts coverage that included December 31, 2011.

"Tail coverage" or "extended reporting period" may be part of a "claims-made" policy. This type of coverage is usually purchased for an additional fee. Tail coverage permits the insured to have an extended reporting period after the expiration of a "claims-made" policy. This coverage is unnecessary if the insured has new coverage with prior acts coverage. Usually, this type of coverage is purchased by those who are retiring, changing professions, or those who cannot obtain prior acts coverage. Tail coverage is usually recommended for two years in Arizona because the statute of limitations for professional negligence claims is usually two years.

## V.   OPINIONS

### A. Fink v. Fritsinger

#### 1. The standard of care

The standard of care requires that an insurance agent have familiarity with the coverages available to his customers as well as any significant exclusions to coverage. If an insurance agent lacks the necessary familiarity, the insurance agent should obtain assistance from a more experienced agent who has such a familiarity or another competent source.

The standard of care requires that an insurance agent who employs other insurance agents as either employees or independent contractors determine whether the employee or independent contractor is familiar with insurance products. If the employee or independent contractor cannot demonstrate sufficient familiarity of insurance products, then the employer must provide training, education, and/or hands on experience sufficient to permit the employee or independent contractor to have sufficient familiarity with the coverages available and any significant exclusions to those coverages. It is insufficient under the standard of care to employ a licensed insurance agent without inquiring into the insurance agent's competency.

An insurance agent must reasonably and seasonably review a client's coverages and recommend additional coverages as may be necessary. An insurance agent must also advise of and recommend, if applicable, additional coverages when new coverages become available to their clients.

When discussing coverages with a potential client, an insurance agent must provide the broadest options available to the prospective client – regardless of whether the insurance agent can obtain the coverage for the customer themselves. If a customer requests coverage that the insurance agent cannot obtain, the standard of care requires that the insurance agent refer the potential client to another insurance agent who can obtain the coverage.

An insurance agent must recommend coverages that meet with the potential client's request for coverage. When more than one product is available that meets with the client's request for coverage, the standard of care requires that the insurance agent provide advice to the prospective client regarding the benefits and drawbacks of the competing products. Price is but one factor to be considered when comparing similar products. Breadth of coverage, exclusions, the insurer's financial strength, ratings, and reviews, as well as the customer's goals in purchasing the insurance are all factors that the insurance agent should discuss with potential clients.

#### 2. Breach of the standard of care

Mr. LaVerdi fell below the standard of care when offering an insurance product, he knew little about. Even though Mr. LaVerdi was unfamiliar with umbrella policies, he did not seek to obtain additional information regarding umbrella policies' coverages and exclusions, nor did he seek the advice of a more experienced insurance agent. At the time Mr. LaVerdi sold the umbrella policy to Dr. Fink, umbrella policies through other companies provided UM/UIM coverage. Mr. LaVerdi, however, did not know that UM/UIM coverage was available within an umbrella policy and did not check with any company other than Safeco to determine whether such coverage was available.

Mr. Fritsinger fell below the standard of care when permitting Mr. LaVerdi to sell insurance products with insufficient education, training, and experience. Mr. Fritsinger had an insurance agency. Mr. LaVerdi was either an employee or an independent contractor who could sell insurance policies through Mr. Fritzinger's insurance agency. Regardless of the relationship between the two, Mr. Fritsinger was required to make sure that the insurance agents who did business through his insurance agency had sufficient education, training, and experience to adequately advise customers.

Mr. Fritsinger fell below the standard of care by permitting Mr. LaVerdi to sell insurance products through Mr. Fritsinger's insurance agency with insufficient education, training, and experience. According to Mr. Fritsinger, he provided little to no education, training, or instruction to Mr. LaVerdi and assumed that since Mr. LaVerdi was licensed by the State, his education, training, and experience was sufficient. According to Mr. LaVerdi, Mr. Fritsinger knew he had no experience and only sufficient training and education to pass the State licensing examination. Mr. Fritsinger walked Mr. LaVerdi through the process of one sale and left Mr. LaVerdi to learn for himself in order to gain sufficient education, training, and experience.

Regardless of the relationship, Mr. Fritsinger fell below the standard of care for an insurance agent by permitting an insurance agent to sell products through his agency without having sufficient education, training, and/or experience.

Mr. LaVerdi fell below the standard of care by not reasonably and seasonably reviewing Dr. Fink's insurance coverages. According to Dr. Fink, he requested UM/UIM coverages in the same amount as his bodily injury coverages. It is unclear whether Mr. LaVerdi thought that this included UM/UIM in the umbrella policy as well, but, Dr. Fink asserts that he thought it did. Mr. LaVerdi, correctly, notes that umbrella coverage is intended to cover a catastrophe and Dr. Fink believed that as well.

Dr. Fink clearly wanted catastrophic coverage for both himself and those who may be injured as the result of some accident caused by Dr. Fink. This is evident from Dr. Fink's request to have UM and UIM coverage in an amount equal to his liability limits. Had Mr. LaVerdi reasonably and seasonably reviewed Dr. Fink's coverage with him, Mr. LaVerdi would have noted that Dr. Fink did not have UM and UIM coverage in his umbrella and would have obtained such coverage for him.

Mr. LaVerdi did not know that UM and UIM coverage was available in an umbrella policy. He, therefore, did not offer the broadest coverage available to Dr. Fink and let Dr. Fink decide whether he wanted the coverage. It was below the standard of care not to offer Dr. Fink the broadest coverage available and permit Dr. Fink the opportunity to obtain the insurance available to him.

Umbrella policies are not all created equal. Some umbrella policies do offer UM and UIM coverage for a small additional fee. According to his deposition, Mr. LaVerdi only offered Dr. Fink the umbrella policy available from Safeco which, at the time he purchased the umbrella policy, UM and UIM coverage were not available from Safeco. Other insurers did offer UM and UIM coverage in their umbrella policies. Yet, Mr. LaVerdi did not inform Dr. Fink of these other umbrella policies which, while more expensive, would provide broader coverage. According to Mr. LaVerdi's deposition, he only offered Dr. Fink the Safeco umbrella policy because it was the most affordable. Price is not the only factor to be considered. Breadth of coverage, strength of the insurer, company ratings, and other factors are also important considerations an insurance agent must advise their client when selecting insurance policies. Since Mr. LaVerdi did not obtain quotes from other companies for Dr. Fink, Mr. LaVerdi fell below the standard of care by not discussing other options with Dr. Fink.

### 3. Miscellaneous matters

Most insurance consumers, regardless of level of education, do not read their insurance policies and are ignorant of the terms, conditions, and exclusions. It is important for an insurance agent to inform their customers of the terms, conditions, and important exclusions of the insurance policies. While, generally speaking, an insurance customer is provided with some materials explaining the policy to the insured, in this case, the materials explaining the umbrella policy did not make any mention, one way or the other, regarding UM and UIM coverage.

Disability insurance and UM and UIM coverage provide distinctly separate coverages that do not overlap. Disability coverage usually pays out a certain, reduced percentage of a person's income should they lose the ability to perform their chosen occupation. UM and UIM coverage provide compensation for pain, suffering, medical bills, disability, disfigurement, loss of income, and scarring that can come from being involved in a motor vehicle collision. Here, while disability insurance covers one similar element (loss of income), it does not provide full reimbursement for even that loss, while UM and UIM coverage do – up to the policy limit. As such, it would not be correct to indicate that UM and UIM coverage should not be sold to a consumer when they have a disability policy.

### B. Fink v. Brown & Brown

As indicated, there is a significant difference between an occurrence-based and a claims-made policy. Personal lines, property and casualty policies are occurrence-based policies. Errors and omissions policies are very unique claims-made policies. Agents, such as Mr. Fritzinger, who deal only with personal lines, property and casualty insurance may reasonably be unfamiliar with the highly specialized claims-made policies that are only sold to people in a professional capacity. While it would behoove a professional to learn about their own errors and omissions policy, it is not unusual for a professional – even an insurance agent – not to understand how their errors and omissions policy works. As such, the standard of care requires insurance agents, such as Brown & Brown, who sell errors and omissions policies to professionals, such as Mr. Fritsinger, to explain the differences between an occurrence-based and claims-made policy. Otherwise, a professional who is very familiar with occurrence-based policies may assume that his errors and omissions policy work in the same manner. Since "claims made" policies are highly specialized and unique, it is incumbent on the insurance agent to take reasonable steps to ensure the professional understands the way a "claims-made" policy works. The standard of care requires more when selling a "claims-made" policy than that of an "occurrence-based" policy, due to the highly unique and specialized nature of a "claims-made" policy.

Brown & Brown fell below the standard of care. According to Mr. Fritsinger's testimony, Brown & Brown never explained how the policy worked. While Brown & Brown did send policy language that explained how the policy worked, most of it was in highly technical language and "legal jargon" that was difficult to decipher. Mr. Fritsinger did not understand how his "claims made" policy worked. Even during his deposition, Mr. Fritsinger had a difficult time understanding it. Advising a consumer of how this highly specialized insurance works by sending technical or legal explanations is insufficient. As such, either a "plain-English" written explanation should have been provided or an insurance agent should have had a conversation with Mr. Fritsinger about how the coverage works so that explanations and examples could be offered. Neither appear to have occurred and, ultimately, Mr. Fritsinger did not understand how his errors and omissions coverage worked.

Since Brown & Brown failed to explain the coverage to him, Mr. Fritsinger did not understand the significance of having his renewal made timely. No one at Brown & Brown explained the significance of having prior acts coverage or that he would lose his prior acts coverage if his renewal was not made timely – until, perhaps, after the fact. The email conveying the quote to Mr. Fritsinger did not inform him that if he did not purchase the new coverage by the end of his prior policy period, he would lose all prior acts coverage. Since the policy premium, with or without the prior acts coverage, was the same, price does not seem to have been a factor. Rather, it appears that Mr. Fritsinger simply had no idea that a delay in renewal – in this case, 15 days – would result in him being uncovered for policy periods where he had already paid for coverage.

It also appears that no one explained the importance of tail coverage to Mr. Fritsinger. When a person leaves their profession, such as what happened with Mr. Fritsinger, at least two years of tail coverage is highly recommended because the statute of limitations for most professional negligence claims is two years. Again, with this very unique insurance coverage, it is a breach of the standard of care for the insurance agent not to have a discussion or provide a "plain-English" explanation of the importance of "tail coverage."

## VI.   CONCLUSION

I believe that Brown & Brown fell below the standard of care by failing to explain the highly technical and specialized errors and omissions policy to Fritsinger when they first consulted with him and the need for tail coverage when Mr. Fritsinger sold his insurance agency and retired.

In accordance with 28 USC 1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of September, 2018

/s/ Mark Spector
Mark Spector

(Electronic signature pursuant to A.R.S. 44-7000, et seq. and 15 USC 7001, et seq.)